### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK
### NEW YORK

| | |
|---|---|
| NORTH AMERICAN CAPACITY INSURANCE COMPANY, ARCH SPECIALTY INSURANCE COMPANY, PELEUS INSURANCE COMPANY<br>Plaintiffs,<br><br>  vs.<br><br>LEMONADE, INC.<br>Defendant. | Civil Action No. |

### COMPLAINT

Plaintiffs North American Capacity Insurance Company ("Swiss Re"), Arch Specialty Insurance Company ("Arch"), and Peleus Insurance Company ("Peleus")  (collectively, the "Carriers"), for their Complaint, allege on knowledge, information, and belief as follows:

### NATURE OF THE ACTION

1.      The Carriers file this action to obtain a judicial determination and declaration as to the parties' rights and obligations under Coalition Cyber Policy No. C-4LWR-081108-CYBER-2021 issued by the Carriers to Lemonade, Inc. ("Lemonade") for the May 5, 2021 to May 5, 2022 **policy period** (the "Policy").[1]

2.      An actual and justiciable controversy has arisen and now exists relating to the parties' respective rights, duties and obligations under the Policy in connection with five putative class actions arising out of Lemonade's allegedly unlawful collection and use of biometric information through its video claims submission process (the "Biometric Data Collection Lawsuits").

---

[1] Terms in bold are defined in the Policy.

3.      The Carriers seek a declaratory judgment that the Policy's Unfair Trade Practices Exclusion bars coverage for the Biometric Data Collection Lawsuits in their entirety, and the Carriers have no defense or indemnity obligations to any party for those lawsuits.

4.      This result is compelled by the plain language of the Policy.  Subject to an exception that does not apply here, the Policy does not apply to any **claim** or **loss** directly or indirectly arising out of, resulting from, based upon, or attributable to "[a]ny false, unlawful, deceptive, or unfair trade practices."  Lemonade's digital claim submission process is its customary way of doing business, and thus a "trade practice" as that term is ordinarily understood.  The Biometric Data Collection Lawsuits allege that such practice is unlawful, deceptive, and/or unfair.  The plain terms of the exclusion therefore bar coverage for those suits.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(a)(1), 2201, and 2202.  There is complete diversity of citizenship between each of the plaintiffs and the sole defendant Lemonade, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      An actual controversy within the meaning of 28 U.S.C. § 2201 exists between the parties concerning their respective rights, duties, and obligations under the Policy

7.      Venue is proper pursuant to 28 U.S.C. § 1391 in that the Policy was issued to Lemonade, which maintains its principal place of business in this district.  Moreover, a substantial part of the events giving rise to the claims at issue in this action occurred in this district, and one of the underlying lawsuits at issue is pending in this district.

## PARTIES

8.      Swiss Re is a corporation organized and existing under the laws of the state of New Hampshire with its principal place of business in New Hampshire.

9.      Arch is a corporation organized and existing under the laws of the state of Missouri with its principal place of business in New Jersey.

10.     Peleus is a corporation organized and existing under the laws of the state of Virginia with its principal place of business in Virginia.

11.     Lemonade is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in New York, New York.

## FACTUAL ALLEGATIONS

### The Nature of Lemonade's Business

12.     Lemonade is an insurance company founded in June 2015 whose mission is to "[h]arness technology and social impact to be the world's most loved insurance company."  *See* Lemonade's June 8, 2020 Form S-1 Registration Statement ("Lemonade Registration Statement"), p. 1.[2]

13.      According to Lemonade, "the claims process represents the most acute pain point in the insurance industry, and it is where animosity toward the industry is most commonly cultivated."  Lemonade therefore seeks to set itself apart from other insurance companies by "[r]eimagining claims for the benefit of the customer, by aligning interests and incentives and removing friction, hassle, cost, and delays[.]" *Id.,* at p. 129.  Lemonade views its unique claims process as "a key driver of our leadership in customer satisfaction." *Id.*

---

[2] The Lemonade Registration Statement is available at:
https://www.sec.gov/Archives/edgar/data/1691421/000104746920003416/a2241721zs-1.htm#cy40510_business

14.      Lemonade's claims process relies on its digital platform, which allows customers to submit claims via Lemonade's mobile apps. *See id.,* p. 13.  Along with providing substantiating documents, Lemonade "also ask[s] the customer to record a video explaining their claims[.]" *Id.,* p. 13.  Claims are then initially evaluated for payment or declination by an artificial intelligence bot called "AI Jim." *See id.*

15.      Lemonade's website features the following depiction of its claims process:[3]



## How Lemonade Claims Work

Seamlessly file claims from your phone - anytime, anywhere

Tap the '**Claim**' button in the Lemonade app

Tell us what happened

Our AI runs dozens of anti-fraud algorithms

If your claim is **instantly** approved, our AI will pay it in seconds

Otherwise, our AI hands over your claim to our devoted team of **humans** to handle ASAP

**The Biometric Data Collection Lawsuits**

16.      Five putative class action complaints have been filed against Lemonade alleging that, through its digital claims process, Lemonade has unlawfully collected, stored, analyzed and/or used customers' biometric data without their knowledge or consent.

***The Pruden Action***

17.      On or about August 20, 2021, Mark Pruden filed a putative class action complaint against Lemonade and several of its subsidiaries in the proceeding captioned *Pruden v. Lemonade, Inc. et al.,* No. 21-cv-07070 (S.D.N.Y.) (the "Pruden Action").

---

[3] The following image was captured from the following website on September 12, 2021: https://www.lemonade.com/claims

18.     A true and correct copy of the complaint in the Pruden Action (the "Pruden Complaint") is attached as Exhibit A.

19.     The Pruden Complaint alleges that Lemonade "extracts customers' biometric data surreptitiously in the claim submission process by requiring its customers to upload a video of themselves narrating the circumstances of their claims" and then uses such data "for fraud detection purposes." Pruden Compl., ¶ 6.

20.     According to the Pruden Complaint, Lemonade collects such data without its customers' knowledge or consent and in contradiction to express or implied assurances in its Terms of Service.

21.     Based on these allegations, the Pruden Complaint asserts causes of action for violation of New York's Uniform Deceptive Trade Practices Act (NY Gen. Bus. Law § 349 *et seq.*), breach of contract, breach of implied contract, unjust enrichment, and declaratory and injunctive relief.

***The Illinois Actions***

22.     In addition, four putative class action complaints arising out of the same alleged conduct have been filed in Illinois Circuit Court (collectively, the "Illinois Actions").

23.     On or about July 15, 2021, Ebony Jones and Marla Walker filed a putative class action complaint against Lemonade in the proceeding captioned *Jones et al. v. Lemonade, Inc.,* No. 2021-CH-03460 (Ill. Cir. Ct., Cook Cnty.) (the "Jones Action").

24.     A true and correct copy of the complaint in the Jones Action (the "Jones Complaint") is attached as Exhibit B.

25.     On or about July 21, 2021, Milton Citchens filed a putative class action complaint against Lemonade in the proceeding captioned *Citchens v. Lemonade Inc.,* No. 2021-CH-03578 (Ill. Cir. Ct., Cook Cnty.) (the "Citchens Action").

26.     A true and correct copy of the complaint in the Citchens Action (the "Citchens Complaint") is attached as Exhibit C.

27.     On or about July 22, 2021, Alexander Clarke filed a putative class action complaint against Lemonade in the proceeding captioned *Clarke et al. v. Lemonade Inc.,* No. 2021-CH03593 (Ill. Cir. Ct., Cook Cnty.) (the "Clarke Action").

28.     A true and correct copy of the complaint in the Clarke Action (the "Clarke Complaint") is attached as Exhibit D.

29.      On or about July 22, 2021, Kyle Swerdlow filed a putative class action complaint against Lemonade in the proceeding captioned *Swerdlow v. Lemonade Insurance Agency, LLC*, No. 2021-CH-03583 (Ill. Cir. Ct., Cook Cnty.) (the "Swerdlow Action").

30.     A true and correct copy of the complaint in the Swerdlow Action (the "Swerdlow Complaint") is attached as Exhibit E.

31.     Like the Pruden Action, the Illinois Actions each allege that Lemonade unlawfully collects biometric data from its customers without their consent through the videos it requires customers to submit in the claims process, which Lemonade allegedly uses for fraud detection purposes.

32.     Each of the Illinois Actions asserts exclusively causes of action for violations of the Illinois Biometric Information Privacy Act, 70 ILCS 14/1 *et seq.* ("BIPA"), which regulates practices associated with the collection, use, safeguarding, handling, storage, retention, and destruction of biometric information.

**The Policy**

33.     The Carriers issued the Policy to Lemonade for the May 5, 2021 to May 5, 2022 **policy period.**  A true and correct copy of the Policy, without the **Application**, is attached as Exhibit F.

34.     Subject to its terms and conditions, the Policy provides third party liability coverage for **claims** first made against an **insured** and reported to the Carriers during the **policy period.**  *See* Policy, Section II.

35.     The Policy defines "**claim**" to include "a written demand for money or services including the service of a suit or institution of arbitration proceedings." *Id.,* Section IX.  "All **claims** that have a common nexus of fact, circumstance, situation, event, transaction, or cause, or a series of related facts, circumstances, situations, events, transactions, or causes will be considered a single **claim** made against you on the date the first such **claim** was made." *Id.*

36.     The Biometric Data Collection Lawsuits are each **claims** against Lemonade and share a "common nexus of fact, circumstance, situation, event, transaction, or cause, or a series of related facts, circumstances, situations, events, transactions, or causes." *Id.*  Therefore, the Biometric Data Collection Lawsuits are deemed a single **claim** under the Policy first made and reported during the **policy period**.

37.     The Policy provides specified third-party liability coverage pursuant to the following insuring agreements: Network and Information Security Liability, Regulatory Defense and Penalties, Multimedia Content Liability, and PCI Fines and Assessments.  *See id.,* Section II.A-D, as amended by endorsements.

38.     The Network and Information Security Liability, Regulatory Defense and Penalties, and PCI Fines and Assessments insuring agreements are facially inapplicable to the Biometric Data Collection Lawsuits.

39.     The Multimedia Content Liability insuring agreement provides specified coverage for "**claims expenses** and **damages** that **you** become legally obligated to pay from a **claim** against **you** for a **multimedia wrongful act**." *Id.,* Section II.C.

40.     The Policy defines "**multimedia wrongful act**" to mean:

> any of the following actually or allegedly committed by **you** in the ordinary course of **your** business in gathering, communicating, reproducing, publishing, disseminating, displaying, releasing, transmitting, or disclosing **media content** …
>
> 1.     defamation, libel, slander, trade libel, infliction of emotional distress, outrage, outrageous conduct, or other tort related to disparagement or harm to the reputation or character of any organization;
>
> 2.     violation of the rights of privacy of an individual, including false light and public disclosure of private facts;
>
> 3.     invasion or interference with an individual's right of publicity, including commercial appropriation of name, persona, voice, or likeness;
>
> 4.     plagiarism, piracy, or misappropriation of ideas under implied contract;
>
> 5.     infringement of copyright, domain name, trademark, trade name, trade dress, logo, title, metatag, slogan, service mark, or service name; or
>
> 6.     improper deep-linking or framing within the electronic content.

*Id.,* Section IX.

41.     The Policy defines "**media content**" to mean "any data, text, sounds, numbers, images, graphics, videos, streaming content, webcasts, podcasts, or blogs but does not mean computer software or the actual goods, products, or services described, referenced, illustrated, or displayed in such **media content**." *Id.*

42.     The Policy contains an Unfair Trade Practice Exclusion, which bars coverage for any amounts "directly arising out of, resulting from, based upon, or attributable to . . . [a]ny false, unlawful, deceptive, or unfair trade practices . . . ." *Id.,* Section III.V, as amended by Miscellaneous Amendments (Gallagher) Endorsement ("Gallagher Endorsement").

43.     The Unfair Trade Practices Exclusion contains an exception for any "**claim** under Sections II.A Network and Information Security Liability or II.B, Regulatory Defense and Penalties arising from a **security failure** or **data breach**." *Id.*

44.     The Policy defines "**security failure**" to mean:

the failure of **computer systems** which results in:

1.     acquisition, access, theft, or disclosure of **personally identifiable information** or **third party corporate information** in **your** care, custody, or control and for which **you** are legally liable;

2.     loss, alteration, corruption, or damage to software, applications, or electronic data existing in **computer systems**;

3.     transmission of **malicious code** from **computer systems** to third party computer systems that are not owned, operated, or controlled by the **named insured** or **subsidiary**; or

4.     a denial of service attack on the **named insured's** or **subsidiary's computer systems**; or

5.     access to or use of **computer systems** in a manner that is not authorized by **you**, including when resulting from the theft of a password.

*Id.,* Section IX.

45.     The Policy defines "**data breach**" to mean "the acquisition, access, the, [sic] loss, or disclosure of **personally identifiable information** or **third-party corporate information** by a person or entity, or in a manner, that is unauthorized by **you**." *Id.,* as amended by Gallagher Endorsement.

**The Coverage Dispute**

46.     Lemonade has submitted the Biometric Data Collection Lawsuits to the Carriers for defense and indemnity coverage under the Policy.

47.     The Carriers have denied coverage for the Biometric Data Collection Lawsuits because the Unfair Trade Practices Exclusion applies.

48.     A number of other Policy provisions may apply to further limit or preclude coverage for the Biometric Data Collection Lawsuits, and the Carriers therefore reserve all rights under the Policy, including the right to rely on additional terms and conditions of the Policy.

49.     The Carriers seek declaratory relief to confirm that they have no defense or indemnity obligations to Lemonade or any party in connection with the Biometric Data Collection Lawsuits.

## COUNT I

**Declaration of No Coverage for the Biometric Data Collection Lawsuits Because the Unfair Trade Practices Exclusion Applies**

50.     The Carriers reallege and incorporate by reference the allegations of paragraph 1 through 49 as if fully set forth in this Count I.

51.     The Policy's Multimedia Content Liability coverage applies to a **claim** made against Lemonade "for a **multimedia wrongful act**."  Policy, Section I.C.  "**Multimedia wrongful act**," in turn, means certain enumerated wrongful conduct "actually or allegedly committed by [Lemonade] in the ordinary course of [its] business in gathering, communicating, reproducing, publishing, disseminating, displaying, releasing, transmitting, or disclosing **media content**, including social media authorized by [Lemonade]."  Policy, Section IX.  "**Media content**," in turn, means "data, text, sounds, numbers, images, graphics, videos, streaming

content, webcasts, podcasts, or blogs but does not mean computer software or the actual goods, products, or services described, referenced, illustrated, or displayed in such **media content**." *Id.*

52.    The Biometric Data Collection Lawsuits only potentially allege a **"multimedia wrongful act"** to the extent that Lemonade's alleged practice of collecting and analyzing biometric information through its video claims submission process constitutes "gathering communicating, reproducing, publishing, disseminating, displaying, releasing, transmitting, or disclosing . . . data." *See id.*

53.    The Policy's Unfair Trade Practices Exclusion broadly bars coverage for **claim expenses, damages, loss** or other amounts "directly arising out of, resulting from, based upon, or attributable to . . . [a]ny . . . unlawful, deceptive, or unfair trade practices . . . ." *Id.,* Section III.V, as amended by Gallagher Endorsement.

54.    As the term is ordinarily understood, a "trade practice" refers to a customary way of doing business.  Lemonade's digital claim submission process is its customary way of doing business, and thus a "trade practice" under the plain meaning of that term.  The Biometric Data Collection Lawsuits all directly arise out of this process, which is alleged to involve the collection, analysis, and use of biometric information without customers' knowledge or consent.

55.    The Biometric Data Collection Lawsuits all predicate liability on the assertion that the claim submission practice noted above is unlawful (i.e., it violates New York's Uniform Deceptive Trade Practices Act and BIPA), deceptive, and/or unfair.

56.    The Unfair Trade Practices Exclusion therefore applies because the Biometric Data Collection Lawsuits are predicated on trade practices that are alleged to be unlawful, unfair or deceptive.

57.     The exception in the Unfair Trade Practices Exclusion for **claims** covered under the Network and Information Security Liability or Regulatory Defense and Penalties insuring agreements "arising from a **security failure** or **data breach"** does not apply because the Biometric Data Collection Lawsuits do not arise out of or allege any **security failure** or **data breach**.

58.     The Biometric Data Collection Lawsuits do not arise from a **security failure** because the alleged unfair trade practices at issue do not involve any "failure of **computer systems**." *See* Policy, Section IX (defining "**security failure**").

59.     Nor do the Biometric Data Collection Lawsuits arise out of a **data breach** because they do not allege the "acquisition, access, . . . loss, or disclosure" of biometric information by any person or entity or in a manner "*that is unauthorized by you*." *Id.,* as amended by Gallagher Endorsement (defining "**data breach**") (emphasis added).  Indeed, the alleged unfair trade practices at issue are an integral part of Lemonade's customary claims process and are therefore plainly authorized by Lemonade.

60.     Thus, even if the Biometric Data Collection Lawsuits fall within the scope of coverage provided by the Multimedia Content Liability insuring agreement (which the Carriers do not concede), the Unfair Trade Practices Exclusion bars coverage for these suits in their entirety.

61.     In addition, there are no allegations that would fall outside the scope of the Unfair Trade Practices Exclusion that could potentially trigger any of the relevant insuring agreements.

62.     As a result, the Carriers have no defense or indemnity obligations in connection with the Biometric Data Collection Lawsuits.

WHEREFORE, the Carriers respectfully request:

A.     As to Count I, the Court declare that the Unfair Trade Practices Exclusion bars

coverage for the Biometric Data Collection Lawsuits in their entirety, and the

Carriers have no defense or indemnity obligations to any party in connection with

the Biometric Data Collection Lawsuits.

B.     That the Court award the Carriers such other and further relief as it may deem

appropriate.


                                              Respectfully submitted,

Dated:

October 1, 2021                               By: _s/John H. Eickemeyer___
                                                  John H. Eickemeyer
                                                  VEDDER PRICE
*Of Counsel:*                                     1633 Broadway, 31st Floor
David H. Topol                                    New York, NY 10019
Edward R. Brown                                   Telephone: (212) 407-7760
Margaret T. Karchmer                              Email: jeickemeyer@vedderprice.com
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
Telephone: (202) 719-7000
Facsimile: (202) 719-7049
Emails: dtopol@wiley.law
        erbrown@wiley.law
        mkarchmer@wiley.law


                                              *Attorneys for Plaintiffs North American*
                                              *Capacity Insurance Company, Arch*
                                              *Specialty Insurance Company, and Peleus*
                                              *Insurance Company*